No. 21-14269

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

STATE OF GEORGIA, et al.,

Plaintiffs-Appellees,

v.

PRESIDENT OF THE UNITED STATES, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Southern District of Georgia

_____

## REPLY BRIEF FOR APPELLANTS

_____

*Of Counsel:*

SAMUEL R. BAGENSTOS
  *General Counsel*

ARPIT K. GARG
  *Deputy General Counsel*

SARAH R. SCHEINMAN
  *Associate Deputy General Counsel*

SHRADDHA A. UPADHYAYA
  *Associate General Counsel*
  *Office of Management and Budget*

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

JOSHUA REVESZ
  *Counsel, Office of the Assistant Attorney*
  *General*

MARK B. STERN
ALISA B. KLEIN
DANIEL WINIK
ANNA O. MOHAN
DAVID L. PETERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 514-1673*

*State of Georgia v. President of the United States*, No. 21-14269

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for defendants-appellants certify that the following have an interest in the outcome of this appeal:

Ahuja, Kiran

Alabama Department of Agriculture and Industries

Alabama Department of Public Health

Alabama Department of Rehabilitation Services

Alabama, State of

*Alaska, State of

American Academy of Allergy, Asthma & Immunology

American Academy of Family Physicians

American Academy of Pediatrics

American College of Chest Physicians

American College of Medical Genetics and Genomics

American College of Physicians

American Geriatrics Society

American Lung Association

American Medical Association

American Medical Women's Association

* Additions to previous certificate marked with an asterisk.

*State of Georgia v. President of the United States*, No. 21-14269

American Psychiatric Association

American Society for Clinical Pathology

American Society of Hematology

American Thoracic Society

Andrapalliyal, Vinita

*Arizona, State of

*Arkansas, State of

Associated Builders and Contractors of Georgia, Inc.

Associated Builders and Contractors, Inc.

Austin, Lloyd

Bagenstos, Samuel R.

Baker, Honorable Stan R., U.S. District Court Judge

Becerra, Xavier

*Bell, Daniel

*Bergethon, Ross W.

Biden, Joseph R.

Black, Gary W.

*Brnovich, Mark

Boynton, Brian M.

*Cameron, Daniel

Capers, Dunbar, Sanders & Belloti LLP

*State of Georgia v. President of the United States*, No. 21-14269

Caplan Cobb LLP

Caplan, Michael

Carnahan, Robin

*Carr, Christopher M.

*Chamber of Commerce for the United States of America

 Chavez, Richard

*Christmas, Natalie

Collins, Francis S.

Criswell, Deanne

Democracy Forward Foundation

Dubner, Jeffrey B.

Dunbar, III, Paul H.

Epps, Honorable Brian K., U.S. Magistrate Judge

*Estes, David

*Fitch, Lynn

*Florida, State of

*Formella, John

*Frederick, Matthew H.

Fried, Rachel L.

Garg, Arpit K.

General Services Administration

*State of Georgia v. President of the United States*, No. 21-14269

Georgia Department of Agriculture

Georgia, State of

*Gonzalez-Araiza, Gabriela

Granholm, Jennifer

Holyoak, Melissa A.

Hydrick, Thomas T.

Idaho State Board of Education

Idaho, State of

*Indiana, State of

*Iowa, State of

Ivey, Kay

Jennings, Kathleen J.

*Joseffer, Daryl

Josephson, Matthew Allan

Kane, Patrick

Kansas, State of

*Keller, Scott A.

Kemp, Brian P.

*Kentucky, State of

Kintz, JoAnn L.

Klein, Alisa B.

Klorfein, Jarred A.

*Knudsen, Austin

LaCour, Jr., Edmund Gerard

Lambert, Wm. Grayson

*Landry, Jeff

Laue, Brant M.

*Lehotsky Keller LLP

*Lehotsky, Steven P.

Limehouse, Jr., Thomas A.

Little, Brad

*Louisiana, State of

*Maloney, Stephanie A.

McDonough, Denis

McMaster, Henry

Melton, Harold David

*Mississippi, State of

*Missouri, State of

Mohan, Anna O.

*Montana, State of

*Moody, Ashley

*Morrisey, Patrick

*State of Georgia v. President of the United States*, No. 21-14269

Morton, Jessica Anne

Murray, James M.

National Aeronautics and Space Administration

National Institutes of Health

National Science Foundation

*Nebraska, State of

Nelson, Bill

*New Hampshire, State of

*O'Connor, John

Office of Management and Budget

Office of the Attorney General of Alabama

*Office of the Attorney General of Alaska

*Office of the Attorney General of Arkansas

*Office of the Attorney General of Florida

Office of the Attorney General of Georgia

Office of the Attorney General of Idaho

*Office of the Attorney General of Indiana

Office of the Attorney General of Kansas

*Office of the Attorney General of Kentucky

*Office of the Attorney General of Louisiana

*Office of the Attorney General of Mississippi

*State of Georgia v. President of the United States*, No. 21-14269

*Office of the Attorney General of Missouri

*Office of the Attorney General of Montana

*Office of the Attorney General of Nebraska

*Office of the Attorney General of New Hampshire

*Office of the Attorney General of Ohio

*Office of the Attorney General of Oklahoma

Office of the Attorney General of South Carolina

*Office of the Attorney General of South Dakota

*Office of the Attorney General of Tennessee

*Office of the Attorney General of Texas

Office of the Attorney General of Utah

Office of the Attorney General of West Virginia

Office of the Governor of Georgia

Office of the Governor of South Carolina

*Office of the Solicitor General of Iowa

Office of the Solicitor General of Kansa

*Ohio, State of

*Oklahoma, State of

Panchanathan, Sethuraman

Parker, Jr., William Glenn

Patrick, Bradford Collins

*State of Georgia v. President of the United States*, No. 21-14269

Patterson, L. Eric

*Paxton, Ken

Peeler, Charles E.

*Percival, James

Peters, David L.

*Peterson, Doug

Petrany, Stephen J.

Raimondo, Gina

*Ravnsborg, Jason

 Reed, Dayton P.

*Reeves, Lee

Revesz, Joshua

*Rokita, Todd

*Rosenberg, Brad P.

*Rutledge, Leslie

Safer Federal Workforce Task Force

Scheinman, Sarah R.

*Schmidt, Derek

*Schmitt, Eric

See, Lindsay S.

Shedd, Michael G.

*State of Georgia v. President of the United States*, No. 21-14269

\*Slatery, Herbert

Smith, Jr., James Emory

Society of Interventional Radiology

South Carolina, State of

\*South Dakota, State

Stern, Mark B.

Stine, J. Larry

The Board of Regents of the University System of Georgia

\*Taylor, Treg

\*Tennessee, State of

\*Texas, State of

\*Thompson, Jeffrey

Troutman Pepper

Tseytlin, Misha

Upradhyaya, Shraddha A.

U.S. Department of Commerce

U.S. Department of Defense

U.S. Department of Energy

U.S. Department of Health and Human Services

U.S. Department of Transportation

U.S. Department of Veterans Affairs

*State of Georgia v. President of the United States*, No. 21-14269

U.S. Office of Personnel Management

Utah, State of

Waldbeser, Drew F.

Walensky, Rochelle

*Wasden, Lawrence G.

West Virginia, State of

*Whitaker, Henry

*Wilson, Alan

Wilson, Thomas A.

Wimberly Lawson Steckel Schneider & Stine PC

Winik, Daniel

*Yost, David

Young, Shalanda

Zanzig, W. Scott

Zients, Jeffrey

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................3

I.   THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS ............................3

    A.   The Procurement Act Authorizes Presidents To Set Policies, Like The Executive Order, That Affect Federal Contractor Operations ..........3

    B.   The Executive Order Reflects The Required Nexus To Economy And Efficiency In Federal Procurement ......................................................10

    C.   No Other Considerations Cast Doubt On The Validity Of The Executive Order ..............................................................................14

    D.   The Task Force Guidance, FAR Memo, And OMB Determination Do Not Suffer From Procedural Infirmities ..............................................19

II.  PLAINTIFFS FAILED TO ESTABLISH THE REMAINING PRELIMINARY INJUNCTION FACTOR ........................................................................... 22

III. THE UNIVERSAL INJUNCTION IS OVERBROAD ...................................... 25

CONCLUSION ................................................................................... 27

# TABLE OF CITATIONS

**Cases:** **Page(s)**

*\*AFL-CIO v. Kahn*,
618 F.2d 784 (D.C. Cir. 1979) ...............................................................8, 14, 17

*Alabama Ass'n of Realtors v. HHS*,
141 S. Ct. 2485 (2021)........................................................................15, 18, 19

*\*American Fed'n of Gov't Emps., AFL-CIO v. Carmen*,
669 F.2d 815 (D.C. Cir. 1981) ........................................................................14

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................ 20

*\*Biden v. Missouri*,
142 S. Ct. 647 (2022)..........................................................................2, 7, 9, 16

*Bilski v. Kappos*,
561 U.S. 593 (2010) ......................................................................................... 5

*Brnovich v. Biden*,
2022 WL 252396 (D. Ariz. Jan. 27, 2022) ........................................... 21, 22

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ....................................................................................... 19

*Building & Construction Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ........................................................................18

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........................................................................................25

*Callahan v. U.S. Department of Health & Human Servs.*,
939 F.3d 1251 (11th Cir. 2019)......................................................................20

*Chamber of Commerce v. Napolitano*,
648 F. Supp. 2d 726 (D. Md. 2009) ................................................................8

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ................................................................17, 18

*City of Albuquerque v. U.S. Department of Interior,*
  379 F.3d 901 (10th Cir. 2004) ................................................................13-14

*Contractors Ass'n of E. Pa. v. Secretary of Lab.,*
  442 F.2d 159 (3d Cir. 1971) ......................................................................8

*Detroit Int'l Bridge Co. v. Government of Canada,*
  189 F. Supp. 3d 85 (D.D.C. 2016) .........................................................21-22

*Dong v. Smithsonian Inst.,*
  125 F.3d 877 (D.C. Cir. 1997) .................................................................20

*Florida v. HHS,*
  19 F.4th 1271 (11th Cir. 2021) ......................................................2, 23, 24

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
  11 F.4th 1266 (11th Cir. 2021) ...........................................................9-10

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999) .................................................................................26

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) .........................................................................3, 17

*Hein v. Freedom from Religion Foundation, Inc.,*
  551 U.S. 587 (2007) .................................................................................12

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
  452 U.S. 264 (1981) .................................................................................18

*Jessup v. United States,*
  106 U.S. 147 (1882) .................................................................................16

*Kentucky v. Biden,*
  2021 WL 5587446 (E.D. Ky. Nov. 30, 2021) ...........................12, 13, 21, 22
  23 F.4th 585, 604 (6th Cir. 2022) ..........................................................5

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) .............................................................................7

*LabMD, Inc. v. FTC,*
  678 F. App'x 816 (11th Cir. 2016) ........................................................23

*Lewis v. Casey,*
   518 U.S. 343 (1996) ..........................................................................25-26

*National Fed'n of Ind. Bus. v. OSHA,*
   142 S. Ct. 661, 663 (2022) ................................................................ 15, 16

*Natural Res. Def. Council, Inc. v. U.S. Department of State,*
   658 F. Supp. 2d 105 (D.D.C. 2009) ............................................................21

*Newspaper Ass'n of Am. v. Postal Regulatory Comm'n,*
   734 F.3d 1208 (D.C. Cir. 2013) ................................................................13

*Siegel v. LePore,*
   234 F.3d 1163 (11th Cir. 2000) ........................................................ 22, 23

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
   576 U.S. 519 (2015) ............................................................................10

*UAW-Labor Emp't & Training Corp. v. Chao,*
   325 F.3d 360 (D.C. Cir. 2003) ................................................8, 13, 17

*United States v. Virginia,*
   139 F.3d 984 (4th Cir. 1998) ..................................................................18

*Utility Air Regulatory Grp. v. EPA,*
   573 U.S. 302 (2014) ........................................................................14-15

*Whitman v. American Trucking Ass'n,*
   531 U.S. 457 (2001) ............................................................................15

*Wilkerson v. Grinnell Corp.,*
   270 F.3d 1314 (11th Cir. 2001) ................................................................19

**Statutes:**

Administrative Procedure Act:
   5 U.S.C. § 553 ....................................................................................19
   5 U.S.C. § 704 ....................................................................................20

Federal Property and Administrative Services Act of 1949:
   40 U.S.C. § 101 ....................................................................1, 3, 5, 11
   40 U.S.C. § 121 ........................................................................... 1, 3

3 U.S.C. § 301 ...................................................................................... 21, 22

41 U.S.C. § 133 .......................................................................................... 21

41 U.S.C. § 1303 ........................................................................................ 22

41 U.S.C. § 1707 ............................................................................... 19, 21, 22

42 U.S.C. § 1395x(e)(9) ................................................................................ 7

**Executive Branch Materials:**

Exec. Order No. 14,042,
    86 Fed. Reg. 50,985 (Sept. 14, 2021) ..............................................17, 21, 22

86 Fed. Reg. 63,418 (Nov. 16, 2021) ....................................9, 11, 12, 13, 14, 22

**Other Authorities:**

CDC, *COVID Data Tracker*,
    https://covid.cdc.gov/covid-data-tracker (last visited Feb. 22, 2022) ......................25

CDC, *Omicron Variant: What You Need to Know Variant*, https://perma.cc/4RW6-
    7SGB (last updated Feb. 10, 2022) ................................................................25

Jessica Mathews, *The Major Companies Requiring Workers to Get COVID Vaccines*,
    Fortune, Aug. 23, 2021, https://perma.cc/2WQZ-SUCA ........................................12

Memorandum from FAR Council to Chief Acquisition Officers, et al., re: Issuance of
    Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021),
    https://perma.cc/9BQ8-XBT6 ......................................................................20

David Schoenbrod, *The Delegation Doctrine: Could the Court Give It Substance*?,
    83 Mich. L. Rev. 1223 (1985) ........................................................................16

Webster's New International Dictionary (2d ed. 1959)
    System ..................................................................................................5

1 Williston on Contracts § 3.2 (4th ed. 2021) ......................................................5

**INTRODUCTION**

The principal question in this case is whether the President may require federal agencies to do business only with contractors that agree to require that their employees be vaccinated. The answer to that question is yes. *See* Opening Br. 14-25. The Procurement Act authorizes the President to "prescribe policies and directives" "necessary" to ensure "an economical and efficient system for" federal contracting. 40 U.S.C. §§ 101, 121(a). The Executive Branch and federal courts have long understood that statutory grant of authority to allow the President to pursue policies that in the President's judgment will improve the economy and efficiency of federal contractors' operations. The challenged Executive Order falls squarely within that tradition. Requiring vaccination decreases absences among the federal contractor workforce due to the transmission of a virulent disease, which, in turn, advances the economy and efficiency of the overall federal procurement system by lowering contracting costs and protecting the public fisc.

Plaintiffs urge that the district court properly enjoined the Executive Order on the ground that it is a public health measure not clearly authorized by Congress. That assertion fundamentally misunderstands the nature and purpose of the Executive Order: It is an exercise of the President's congressionally granted procurement powers, not a regulation of public health, and nothing required Congress to more clearly authorize the President to issue it. Plaintiffs are also mistaken to suggest that sustaining

the Executive Order would give the President virtually limitless authority. The Executive Order imposes workplace requirements that are tailored to the unique threats the pandemic poses to government operations and that have been imposed by entities of all types in analogous situations. Plaintiffs' restrictive reading of the Procurement Act departs from the statute's long-established meaning, and is at odds with the Supreme Court's recent decision in *Biden v. Missouri*, 142 S. Ct. 647 (2022), which holds that a longstanding practice like the one here forecloses attempts to narrow the broad language included in a statutory grant of authority.

The injunction should also be set aside because plaintiffs failed to establish the remaining requirements for preliminary relief. This Court's decision in *Florida v. Department of Health & Human Services*, 19 F.4th 1271 (11th Cir. 2021), forecloses plaintiffs' claims that they face irreparable harm in the form of compliance costs and potentially lost employees. In contrast, the district court's order precludes the implementation of measures designed to protect the performance of federal contracts from extended absences resulting from COVID-19 and its variants. Plaintiffs' insistence that the injunction maintains the "status quo" ignores these harms and the dynamic challenges the pandemic continues to pose to federal contracting.

Finally, the district court's patently overbroad injunction should be limited to those few plaintiffs and ABC members who established standing or, at a minimum, to the other plaintiffs' and ABC members' own contracts with the federal government.

2

# ARGUMENT

## I.   THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

### A.   The Procurement Act Authorizes Presidents To Set Policies, Like The Executive Order, That Affect Federal Contractor Operations

**1.**    Plaintiffs do not dispute that the Procurement Act authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" the Act.  40 U.S.C. § 121(a).  And plaintiffs acknowledge that in determining which policies "carry out" the statute, it is appropriate to look to § 101, which states that the Procurement Act's "purpose … is to provide the Federal Government with an economical and efficient system for," among other things, "[p]rocuring … property and nonpersonal services, and performing related functions including contracting."  40 U.S.C. § 101; *see Gundy v. United States*, 139 S. Ct. 2116, 2127 (2019) (plurality op.) (explaining that a statute's statement of purpose "is an appropriate guide to the meaning of the statute's operative provisions" (cleaned up)).  These provisions make clear that the Procurement Act empowers the President to "prescribe policies and directives that the President considers necessary" to "provide the Federal Government with an economical and efficient system for … [p]rocuring … property and nonpersonal services, and performing related functions including contracting."  40 U.S.C. §§ 101, 121.[1]

---

[1] That "economy" and "efficiency" appear elsewhere in the statute underscores that those goals guide the statute's operative grants of authority.  *Contra* States Amicus Br. 8.

The Executive Order falls well within that express grant of statutory authority. Requiring contractors' employees to become vaccinated against COVID-19 advances the economy and efficiency of contractor operations by decreasing the likelihood that those employees will miss work or transmit the virus to their coworkers. And ensuring that federal contractor performance is more efficient enhances the economy and efficiency of the federal procurement system by enabling the government to avoid entering into costly extensions or paying millions of dollars in unanticipated leave expenses.

2.    Plaintiff States urge this Court to depart from the decades-old understanding of the Procurement Act and limit its reach to policies like "cross-agency communication," "record keeping," and information sharing that affect the "logistics" of the federal government's entry into contracts. States Br. 25-26. They insist that the statute does not permit the President to set standards governing the performance of those contracts. States Br. 26. The States derive this limitation from the statute's reference to the federal government's "system for" procurement and argue that policies that affect the "internal operations of federal contractors" have "nothing to do with optimizing" that overall procurement system. *Id.* (emphasis omitted); *see* States Br. 29 ("[I]t is the economy and efficiency of the federal government's 'system *for*' obtaining goods and services, *not* the 'economy and efficiency' of the entities that provide goods and services to the government."); States Amicus Br. 7-10.

Nothing in the Procurement Act's text supports such a restrictive interpretation, even accepting the States' definition of its terms. The States define "system" as "[a]

4

formal scheme or method of governing organization, arrangement." States Br. 26 (alteration in original) (quoting *Kentucky v. Biden*, 23 F.4th 585, 604 (6th Cir. 2022) (quoting *System*, Webster's New International Dictionary 2562 (2d ed. 1959))). Providing the federal government with a "formal scheme or method" for "procuring … nonpersonal services" and "performing related functions, including contracting" necessarily includes setting the terms on which those services are to be acquired and contracts are to be performed. Indeed, it is impossible to enter into a contract without agreement on its terms. *See* 1 Williston on Contracts § 3.2 (4th ed. 2021) (noting that, for a contract to be enforceable, there must be agreement on essential terms); *cf. Bilski v. Kappos*, 561 U.S. 593, 607 (2010) (explaining that term "'method' … include[s] at least some methods of doing business"). The Procurement Act also specifically lists "setting specifications" among the functions for which the President should act to ensure economy and efficiency. 40 U.S.C. § 101(1). That language underscores the evident import of the statute's more general text: A "system for" procurement will not be "economical and efficient" *as a system* if it purchases overpriced or lower-quality goods or services—even if it is effective at facilitating the process of locating and entering into contracts for those goods or services.

The States are wrong in asserting that "the relative efficiency of a given contractor in conducting operations does not affect the efficiency of the government *system* for locating and entering into contracts." States Br. 29. To use the States' analogy (at 26),

a company cannot establish an efficient system for obtaining groceries without considering how the company's supply contracts will actually be performed. To make that "system for" grocery procurement more efficient, the company would need to establish contract requirements that make it more likely that the company's suppliers will provide high quality groceries on the outlined delivery schedule without incurring unforeseen additional costs.

The States' proposed distinction between requirements that "directly" enhance economy and efficiency and those that do so "indirectly" rests on the same misunderstanding. States Br. 29. The question is not whether obtaining economy and efficiency in contract performance indirectly improves "cross-agency communication," "record keeping," or "logistics"—words that are nowhere in the Procurement Act's text. The President is charged with overseeing a procurement system for obtaining goods and services, and the performance of procurement contracts is at the heart of that responsibility.

**3.** The longstanding practice of all three branches of government reflects the terms of the statute.

a. As plaintiffs do not dispute, executive orders issued under the Procurement Act have consistently been directed at improving the performance of federal contracts. *See* Opening Br. 16.

Plaintiffs do not offer a different view of this longstanding executive practice. Instead, the States contend that "the executive's past understanding of its authority" is

6

not persuasive evidence of the statute's meaning. States Br. 45 (emphasis omitted). That is incorrect. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in the judgment) (observing that "the government's early, longstanding, and consistent interpretation of a statute" is "powerful evidence of its original public meaning" (emphasis omitted)).

The Supreme Court also recently rejected the same argument in *Biden v. Missouri*, holding that the Executive Branch may "impose[] conditions of participation" on Medicare and Medicaid recipients that include a vaccination requirement. 142 S. Ct. 647, 653 (2022). The statute there "authorized the Secretary to impose conditions on the receipt of Medicaid and Medicare funds that 'the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services.'" *Id.* at 652 (quoting 42 U.S.C. § 1395x(e)(9)). The Court rejected a "narrower view" of that "seemingly broad language," explaining that "the longstanding practice of [the agency] in implementing the relevant statutory authorities tells a different story." *Id.* The Court emphasized, moreover, that it did not matter that the vaccination requirement "goes further than what the [agency] has done in the past to implement" its statutory authorities because the agency "has never had to address an infection problem of this scale and scope before." *Id.* at 653. That is equally true here, where the "longstanding practice" encompasses decades of executive practice interpreting the statute to authorize orders improving the economy and efficiency of contractors' operations and where the pandemic poses unique challenges to the federal procurement system.

7

b.    The States' interpretation of the Procurement Act is also inconsistent with decades of judicial decisions upholding orders on the ground that improving the economy and efficiency of contractors' operations would improve the economy and efficiency of the federal government's system for procurement. *Contractors Association of Eastern Pennsylvania v. Secretary of Labor* upheld an anti-discrimination order because it would reduce "costs and delay[s]" in federal government programs, 442 F.2d 159, 170 (3d Cir. 1971); *UAW-Labor Employment & Training Corporation v. Chao* upheld an order requiring contractors to post employee notices because it would enhance the "productivity" of contractor employees, "facilitat[ing] the efficient and economical completion of … procurement contracts," 325 F.3d 360, 366 (D.C. Cir. 2003) (citation omitted); and *Chamber of Commerce v. Napolitano* upheld an order requiring contractors to ensure that their employees are lawfully present in the United States based on the President's judgment that such assurances would create more "efficient … procurement sources," 648 F. Supp. 2d 726, 738 (D. Md. 2009).  As the D.C. Circuit concluded in *AFL-CIO v. Kahn*, the President's authority to achieve an economical and efficient system for federal procurement extends to policies that address "those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions."  618 F.2d 784, 789 (D.C. Cir. 1979) (en banc); *see* Opening Br. 15-18.[2]

---

[2] Those cases likewise demonstrate why amici States are incorrect that the President's authority is limited to "required" or "indispensable" orders, States Amicus Br. 8-9 (citation omitted).

Plaintiffs attempt to distinguish those cases as involving "modest 'work-anchored'" orders, with a "close relation to 'the ordinary hiring, firing, and management of labor,'" States Br. 41, 44 (citations omitted); *see* ABC Br. 17-19.  Even if that characterization were accurate, it reflects an acknowledgment that courts sustained executive orders directed to the performance of contracts, not to the process of locating and entering into those contracts.  In any event, the Executive Order at issue is explicitly work anchored:  It applies only to contractor employees performing work on federal contracts or sharing workplaces where work on federal contracts is taking place.  *See* 86 Fed. Reg. 63,418, 63,419 (Nov. 16, 2021).  And, as private sector practice illustrates, vaccination requirements are as much a part of "management of labor" as other orders issued over the decades.  *See id.* at 63,422; *cf. Missouri*, 142 S. Ct. at 653 (emphasizing that "[v]accination requirements are a common feature of the provision of healthcare in America" in upholding a healthcare vaccination requirement).

c.    That Congress, in the wake of this consensus, has reenacted the Procurement Act without restricting the President's power is further evidence of the breadth of the statute's grant of authority.  *See* Opening Br. 18-19.

The States protest that "congressional silence is … a poor beacon to follow." States Br. 43 (citation omitted).  This case involves not just congressional silence, but congressional recodification without substantive change.  In those circumstances, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation." *Fort Lauderdale Food Not Bombs v. City of Fort*

*Lauderdale*, 11 F.4th 1266, 1280 (11th Cir. 2021) (citation omitted).  That presumption applies even where the "uniform interpretation" arises from "inferior courts," and not the Supreme Court.  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015) (citation omitted).  And although only a handful of appellate courts have had occasion to evaluate Procurement Act orders, they have uniformly (until now) applied the nexus test and accepted that the Act authorizes the President to issue orders that improve the efficiency of contractors' operations.  *See* Opening Br. 16-18; *infra* pp. 10-14.

The States mistakenly seek to derive support (at 27-28) from Congress's enactments of the Office of Federal Procurement Policy Act and the Competition in Contracting Act.  It is perfectly appropriate, however, for Congress to provide in different statutes concurrent authority to manage aspects of procurement to the President, the Office of Federal Procurement Policy, and the Federal Acquisition Regulatory Council.  Those statutes do not, of course, infringe on the authority of the President and federal agencies to establish substantive contract requirements.

**B.    The Executive Order Reflects The Required Nexus To Economy And Efficiency In Federal Procurement**

The Executive Order manifestly reflects the required nexus to the Procurement Act's goals of economy and efficiency in federal procurement.  *Contra* States Br. 46-52.  Directing the inclusion of a COVID-19 safety clause reduces the likelihood that contractor employees will contract a severe and highly transmissible illness and thus enables

the government to avoid entering into costly contract modification extensions or paying millions of dollars in unanticipated leave expenses. *See* Opening Br. 20-21.

Plaintiffs fundamentally misconceive the nature of the Executive Order when they urge that sustaining its provisions would mean that the Procurement Act could be used to "impose *any* regulation of any kind, on anyone." States Br. 29; *see* States Br. 30-31 (suggesting that "the government's theory" "does not limit the President's authority to federal contractors"). The Executive Order does not regulate private parties—it directs agencies to include a clause in certain federal contracts with certain federal contractors who elect to do business with the United States.[3] Even as to those federal contractors that agree to those terms, the Executive Order does not affect all employees, because it does not reach employees who are not performing federal contracting work and who are working in locations unrelated to that work. *See* 86 Fed. Reg. at 63,419.

Any executive order issued under the Procurement Act must be reasonably related to the statutory goals of establishing "an economical and efficient system for" federal procurement and contracting, 40 U.S.C. § 101. That the requirements at issue achieve those goals is underscored, as the Acting Office of Management and Budget (OMB) Director explained, by private employers' voluntary application of similar requirements to their employees. The States assert (at 51-52) that private employers imposed these requirements in response to federal mandates and that they offered testing

---

[3] Amici States are thus mistaken when they argue (at 10-12) that the Executive Order does not "*direct*[] the actions of inferior officials."

options.  But OMB cited examples of countless employers who applied vaccination requirements before the Executive Order was issued in September 2021.  86 Fed. Reg. at 63,422 & n.13 (citing Jessica Mathews, *The Major Companies Requiring Workers to Get COVID Vaccines*, Fortune, Aug. 23, 2021, https://perma.cc/2WQZ-SUCA).  And the decision of certain employers to offer testing alternatives does not change the fact that those employers concluded it was in their business interest to minimize the spread of a virulent disease among their workforce.  Workplace requirements that address the unique, and very real, threats of a pandemic to government operations and that have also been imposed by entities of all types in analogous situations cannot be likened to hypothetical "Body Mass Index," "celibacy," or "dieting" requirements designed to improve the general health of the federal contractor workforce, States Br. 30; *see* ABC Br. 21.  And "[i]n the unlikely event that any of these executive actions did take place, Congress could quickly step in" and "these improbable abuses could … be challenged in federal court."  *Hein v. Freedom From Religion Found. Inc.*, 551 U.S. 587, 614 (2007).

Plaintiffs contend that OMB did not cite enough evidence showing how the requirements "will save the government money" and "ignore[d] that employee terminations and departures will inevitably follow from" the requirements.  States Br. 49-51; *see* States Amicus Br. 16-17, 23-26.  The Acting OMB Director, however, conducted a "thorough and robust economy-and-efficiency analysis" that fully "addressed potential effects on the labor force and costs of the vaccine mandate."  *Kentucky v. Biden*, __ F. Supp. 3d __, 2021 WL 5587446, at *12 (E.D. Ky. Nov. 30, 2021).  She considered data

12

from "experiences shared by private companies" before reaching her conclusion that "few employees" would "quit because of the vaccine mandate." 86 Fed. Reg. at 63,422. And she determined that the requirements would result in savings to the government after analyzing the "substantial costs" associated with lost federal contractor work hours and predicting that those costs would "be passed on to the Federal Government, either in direct cost or lower quality, including delays." *Id.* Plaintiffs might disagree with those conclusions, but "[w]hen, as here, an agency is making predictive judgments about the likely economic effects of a rule," courts "are particularly loath to second-guess its analysis." *Kentucky*, 2021 WL 5587446, at *12 (alteration in original) (quoting *Newspaper Ass'n of Am. v. Postal Regulatory Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013)).[4]

The Acting OMB Director's economy-and-efficiency rationale is more extensive than explanations offered in previously upheld executive orders. In *Chao*, the D.C. Circuit deemed a one-sentence analysis of the economy-and-efficiency impact sufficient to support a procurement rule requiring employee labor rights posters. *See* 325 F.3d at 366. In *City of Albuquerque v. U.S. Department of the Interior*, the Tenth Circuit upheld an economy-and-efficiency determination providing even less exposition. *See* 379 F.3d

---

[4] The States note (at 51) that OMB cited a study reporting that 5% of unvaccinated adults surveyed quit because of a vaccination requirement and 37% said they would quit if their employer imposed one. However, OMB also noted that "the experience of private companies is to the contrary" with United Airlines and Tyson Foods respectively reporting 99.7% and 96% compliance with their requirements. 86 Fed. Reg. at 63,422. These experiences led OMB to conclude there was no "systematic evidence that this has been a widespread phenomenon, or that it would be likely to occur among employees of Federal contractors." *Id.*

901, 914 (10th Cir. 2004).  And although the Executive Order may not contain the same hardship exception as the order in *Kahn* (States Br. 50), it directs agencies to provide accommodations for individual employees who seek disability or religious exceptions to the vaccination requirement, 86 Fed. Reg. at 63,420.

Finally, the fact that the Executive Order also protects the health and safety of citizens does not make its economy-and-efficiency rationale impermissibly "pretextual," States Br. 48.  Exercises of Procurement Act authority often further goals in addition to economy and efficiency.  *See* Opening Br. 23-24.  The President's determination of how best to achieve economy and efficiency in federal operations does not "become[] illegitimate," simply because, "in addition to" advancing those goals, it "serves other, not impermissible, ends as well."  *American Fed'n of Gov't Emps., AFL-CIO v. Carmen*, 669 F.2d 815, 821 (D.C. Cir. 1981).  Plaintiffs offer no response to this authority.

## C.   No Other Considerations Cast Doubt On The Validity Of The Executive Order

Plaintiffs maintain that Congress was required to speak more clearly if it intended to authorize the Executive Order because it implicates issues of "vast economic and political significance" and "alter[s] the balance between federal and state power."  States Br. 31, 38 (citations omitted); *see* ABC Br. 15-17, 29-31.  Neither of those theories supports requiring a clearer statement of authority.

**1.**     The economic and political significance of an issue is relevant only when an agency action would "bring about an enormous and transformative expansion

in … regulatory authority." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see* Opening Br. 25-30.  No such expansion occurred here because the President exercised only his proprietary authority—as purchaser of services—to impose conditions on the performance of federal contracts.

There is ample support for applying these principles only in cases involving exercises of regulatory, as opposed to proprietary, authority.  All of the cases plaintiffs cite (States Br. 32-34; ABC Br. 15-17, 29-31) involved exercises of regulatory authority unrelated to the federal government's purchasing power.  *Alabama Association of Realtors v. Department of Health & Human Services*, for example, involved an eviction moratorium that the Centers for Disease Control & Prevention (CDC) imposed on "all residential properties nationwide," 141 S. Ct. 2485, 2486 (2021), pursuant to its authority "to make and enforce such regulations as in [the CDC's] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases," *id.* at 2487 (quoting 42 U.S.C. § 264(a)).  *National Federation of Independent Business v. Occupational Health & Safety Administration* (*NFIB*) involved an OSHA standard that applied to "all who work for employers with 100 or more employees."  142 S. Ct. 661, 663 (2022).  And *Utility Air* was concerned that the EPA's regulation of greenhouse gases would "bring about an enormous and transformative expansion in … regulatory authority."  573 U.S. at 324; *see also Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001) ("Congress … does not alter the fundamental details of a *regulatory* scheme in vague terms or ancillary provisions." (emphasis added)).  In contrast, where the government exercised its spending

power to impose a vaccination requirement on Medicare and Medicaid recipients, the Court declined to require an authorization more specific than definitional provisions empowering the Secretary to impose conditions he "finds necessary in the interest of … health and safety." *Missouri*, 142 S. Ct. at 652.

As the States acknowledge, one reason courts have considered the economic and political significance of an agency action is to "guard[] against unintentional, oblique, or otherwise unlikely delegations of *legislative* power." States Br. 35 (emphasis added) (quoting *NFIB*, 142 S. Ct. at 669 (Gorsuch, J., concurring)). A President does not assume legislative power when he exercises only proprietary authority. Rather, powers granted to manage government property and enter into contracts relate to the President's inherent authority to manage the Executive Branch, and thus generally do not involve "an abdication of the 'law-making' function." David Schoenbrod, *The Delegation Doctrine: Could the Court Give It Substance*?, 83 Mich. L. Rev. 1223, 1266-1267 (1985) (citation omitted); *cf. Jessup v. United States*, 106 U.S. 147, 152 (1882) (collecting cases establishing that "the United States can, without the authority of any statute, make a valid contract").

The States respond that "[a] hypothetical source of power the President does not actually assert" cannot undermine application of these principles "to the statute the President *did* rely on." States Br. 37. The point, however, is not whether the President relied on his inherent authority but whether the exercise of proprietary functions implicates the same types of concerns present in the decisions cited by plaintiffs. The

President's inherent authority to manage the Executive Branch bears directly on the question whether the Procurement Act requires a clearer delegation because when, as here, the President acts in an area "where he enjoys his own inherent Article II powers," Congress can "assign the President broad authority" without raising concerns. *Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting); *id.* at 2140 (noting that under "traditional teachings," broadly worded delegations are permissible where they "at least arguably, implicated the president's inherent Article II authority"). In any event, plaintiffs are mistaken in stating that the Executive Order does not reference the President's inherent powers; it states that the President, in addition to exercising authority under the Procurement Act, is exercising "authority vested in me as President by the Constitution." 86 Fed. Reg. 50,985, 50,985 (Sept. 14, 2021).[5]

The States nevertheless insist that the Executive Order "*is* an exercise of regulatory authority." States Br. 36. The two D.C. Circuit cases on which they rely for that proposition underscore the States' misunderstanding of the President's authority here. *Chamber of Commerce v. Reich* and *Chao* considered whether orders precluding the use of replacement workers for striking employees and requiring employers to post employee-rights notices violated principles of preemption under the National Labor Relations

---

[5] The same principles underscore why the Procurement Act does not violate nondelegation principles. *Contra* States Br. 39-40. Congress regularly uses general delegations when authorizing the Executive to expend public funds, and the Act's economy-and-efficiency standard supplies an intelligible principle that can be applied "to determine whether [the President's] actions are within the legislative delegation." *Kahn*, 618 F.2d at 793 n.51.

Act (NLRA). To the extent those courts discussed the distinction between regulatory and proprietary orders, they did so only in the context of "labor relations policy"—a context that "is different because of the NLRA and its broad field of pre-emption." *Reich*, 74 F.3d 1322, 1337 (D.C. Cir. 1996). Even in that context, moreover, the D.C. Circuit has rejected the theory that the government exercises regulatory authority whenever it "acts through blanket, across-the-board rules." *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 35 (D.C. Cir. 2002) (citation omitted). What matters instead is whether the government disqualifies contractors "on the basis of conduct unrelated to any work they were doing for the Government." *Id.* That is not the case here where the requirements apply only to workers and workplaces associated with the performance of federal contracts.

  **2.**  The Executive Order also does not "significantly alter the balance between federal and state power," States Br. 38 (quoting *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489). The States do not dispute that the President can exercise his authority in a manner that displaces the states' police powers. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981). Nor do they dispute that the federal government— not the states—has the power to set conditions on federal contracts and to police the behavior of federal contractors. *See United States v. Virginia*, 139 F.3d 984, 987 (4th Cir. 1998). That ends the matter: Because the Executive Order is an exercise of the President's authority to manage the terms on which services are procured for the federal government, it does not alter the federal-state balance.

18

*Alabama Association of Realtors*, on which the States principally rely, confirms as much. There, the Supreme Court demanded "exceedingly clear [statutory] language" to justify the agency's "intru[sion] into an area that is the particular domain of state law: the landlord-tenant relationship." 141 S. Ct. at 2489 (citation omitted). The relationship between federal agencies and their contractors is different. It "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). The relationship is thus "inherently federal in character" and does not present federalism concerns. *Id.*

### D. The Task Force Guidance, FAR Memo, And OMB Determination Do Not Suffer From Procedural Infirmities

The States are also mistaken when they argue that the Task Force Guidance, FAR Memo, and OMB Determination are procedurally defective because they did not undergo the notice-and-comment procedures described in 41 U.S.C. § 1707. States Br. 52-55.[6] The district court did not reach these issues, and this Court need not do so in the first instance. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 n.4 (11th Cir. 2001). Those challenges do not provide alternative grounds for affirming the district court's decision, in any event.

**1.** As to the Task Force Guidance and the FAR Memo, plaintiffs do not have a cause of action to challenge the purported procedural deficiencies.

---

[6] Plaintiffs do not (and cannot) contend that these decisions are subject to the Administrative Procedure Act (APA)'s notice-and-comment requirement, which does not apply to "matter[s] relating to … contracts." 5 U.S.C. § 553(a)(2).

Neither the Task Force Guidance nor the FAR Memo constitutes "final agency action" reviewable under the APA.  5 U.S.C. § 704.  The Guidance was issued by the Safer Federal Workforce Task Force, which is an entity within the Executive Office of the President that exists solely to advise the President and thus lacks the "substantial independent [government] authority" required of an "agency" under the APA, *Callahan v. U.S. Department of Health & Human Servs.*, 939 F.3d 1251, 1265 (11th Cir. 2019) (alteration in original) (quoting *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997)).  And neither the Task Force Guidance nor the FAR Memo is "final" because they do not "mark the 'consummation' of the agency's decisionmaking process," and are not actions "from which 'legal consequences will flow,'" *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997).  The Task Force Guidance has no standalone legal force; it becomes binding only following the OMB Director's economy-and-efficiency determination.  And the FAR Memo provides agencies only with "*initial* direction" for the incorporation of a sample COVID-19 safety clause into applicable contracts.  Memorandum from FAR Council to Chief Acquisition Officers, et al., re: Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021), https://perma.cc/9BQ8-XBT6 (emphasis added).  The FAR Memo has no effect until an agency decides to incorporate the clause into a contract.  It also necessarily contemplates further action—namely, a

forthcoming FAR Amendment including the final COVID-19 safety clause. *See Kentucky*, 2021 WL 5587446, at *11; *Brnovich v. Biden*, 2022 WL 252396, at *23 (D. Ariz. Jan. 27, 2022).[7]

    **2.**    It is not clear that plaintiffs can challenge the OMB Determination under the APA, *see Brnovich*, 2022 WL 252396, at *14, but even assuming they can, their procedural challenge fails because the OMB Determination is not subject to § 1707's procedural requirements. Those requirements apply only to "executive agenc[ies]." 41 U.S.C. § 1707(c)(1). The Acting OMB Director was not acting as one of those "executive agencies" when she issued the OMB Determination. Instead, she was exercising authority expressly delegated to her by the President under 3 U.S.C. § 301. *See* 86 Fed. Reg. at 50,985-986. Because the President is not listed among the executive agencies subject to § 1707's requirements, *see* 41 U.S.C. § 133, the Acting OMB Director also was not subject to those requirements when she "st[ood] in the President's shoes" and exercised his delegated authority to issue the OMB Determination, *Natural Res. Def. Council, Inc. v. U.S. Department of State*, 658 F. Supp. 2d 105, 109 & n.5, 111 (D.D.C. 2009); *see also Detroit Int'l Bridge Co. v. Government of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016)

---

[7] Even if plaintiffs had a cause of action, their challenge would fail because, for similar reasons, the Task Force Guidance and FAR Memo are not "procurement polic[ies], regulation[s], procedure[s], or form[s]" subject to § 1707's requirements. 41 U.S.C. § 1707(a)(1); *see Kentucky*, 2021 WL 5587446, at *11; *Brnovich*, 2022 WL 252396, at *23.

(collecting cases "conclud[ing] that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential'"), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018).[8]

The Acting OMB Director voluntarily complied with § 1707, in any event. Section 1707 authorizes agencies to "waive[]" its notice-and-comment requirements "if urgent and compelling circumstances make compliance with the requirements impracticable." 41 U.S.C. § 1707(d). Here, the Acting OMB Director explained that waiving § 1707's notice requirements was critical to providing federal contractors and subcontractors needed regulatory certainty to implement the Executive Order's requirements. 86 Fed. Reg. at 63,424. The "broader economy-and-efficiency purpose of this determination," the Acting OMB Director concluded, "would be severely undermined by the minimum delay" required under § 1707's notice-and-comment provisions. *Id.*; *see Kentucky*, 2021 WL 5587446, at * 12; *Brnovich*, 2022 WL 252396, at *22-23.

## II. PLAINTIFFS FAILED TO ESTABLISH THE REMAINING PRELIMINARY INJUNCTION FACTOR

Plaintiffs have not established that the Executive Order will cause them irreparable harm, "the *sine qua non* of injunctive relief," *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (citation omitted). Plaintiffs emphasize the compliance costs

---

[8] The President delegated to the OMB Director the authority to make an economy-and-efficiency determination, 86 Fed. Reg. at 50,985, not to issue "government-wide regulation[s]," *contra* States Amicus Br. 13 (citation omitted). That delegation is consistent with both 3 U.S.C. § 301 and 41 U.S.C. § 1303.

they will incur because of the Executive Order (States Br. 56; ABC Br. 24), but as the States acknowledge (at 56), "[o]rdinary compliance costs are typically insufficient to render harm irreparable," *LabMD, Inc. v. FTC*, 678 F. App'x 816, 821 (11th Cir. 2016). Plaintiffs nonetheless assert, without elaboration, that their costs are somehow "not ordinary," States Br. 56 (emphasis omitted); ABC Br. 25. This Court, however, recently rejected a nearly identical claim of irreparable harm in *Florida v. Department of Health & Human Services*, 19 F.4th 1271 (11th Cir. 2021), concluding in that case that the plaintiff State failed to establish an injury sufficient to warrant injunctive relief, despite the State's assertion that it would incur substantial and nonrecoverable costs from complying with a vaccination requirement imposed as a condition of federal funding, *id.* at 1276, 1292 & n.6. If the claimed compliance costs in *Florida* could not support injunctive relief, neither can plaintiffs'.[9]

This Court's decision in *Florida* also dooms plaintiffs' claims that they will suffer irreparable harm because their employees will quit or be fired rather than be vaccinated. Although the States note the number of employees at certain state institutions that have not yet complied with vaccination requirements, Tr. 32, 71-72, 93, plaintiffs admittedly

---

[9] The States also suggest that they may lose out on future contracts because it "is far from certain" that they "can comply with the mandate." States Br. 59 (emphasis omitted). Any claim of irreparable harm premised on some future contract solicitation for which plaintiffs may (or may not) be eligible because they may (or may not) meet all bid requirements is too "remote [and] speculative" to warrant preliminary relief. *Siegel*, 234 F.3d at 1176 (citation omitted).

"have no way of knowing" how many employees will seek an exception under the Executive Order, how many exceptions will be granted, and, in the event an exception is denied, how many employees will actually leave their roles rather than be vaccinated, Tr. 49. At most, then, plaintiffs' evidence suggests that some unknown number of employees may quit or be fired rather than be vaccinated. As this Court made clear in *Florida*, however, evidence establishing "nothing more than that 'some employees' may resign rather than be vaccinated" is "entirely speculative" and does not "show[] an irreparable injury is likely." 19 F.4th at 1292. Plaintiffs do not even acknowledge *Florida*, much less distinguish its irreparable harm holding.

In contrast to plaintiffs' speculative claims of irreparable injury, the government daily suffers concrete harm from the court's overbroad injunction. Plaintiffs do not dispute that the injunction affects hundreds of billions of dollars in federal contracts, including contracts critical to maintaining national security and to combatting the COVID-19 pandemic. Nor do plaintiffs dispute that the productivity losses the pandemic causes those contracts—in the form of schedule delays as well as leave and health care costs—are passed on to the government, and, ultimately, to the American taxpayers.

Plaintiffs nevertheless insist that the injunction is necessary to maintain the "status quo." States Br. 61; ABC Br. 28. As the emergence of new variants starkly illustrates, there is no static status quo in this pandemic; indeed, since the commencement of this appeal, roughly 29 million more COVID-19 cases have been reported in the

24

United States.[10]  CDC, *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker (last visited Feb. 22, 2022).  How to address the evolving challenges the virus poses to the delivery of essential services to the American people is a question best left to the President, as the politically accountable head of the Executive Branch, not to unelected courts.

## III.    THE UNIVERSAL INJUNCTION IS OVERBROAD

Plaintiffs offer no cogent defense of the district court's overbroad injunction. Article III and principles of equity dictate that the injunction should be limited to those plaintiffs who demonstrated standing before the court—that is, the State of Georgia and two ABC members.  Opening Br. 43-44.  Granting relief to the remaining plaintiff States and ABC members who established no injury subverts the rule that relief should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Even assuming the injunction could extend to the federal contracts of the other plaintiff States and ABC members, there are no grounds to afford relief to the countless federal contractors who were not parties to this action.  Non-party contractors are "not

---

[10] ABC erroneously argues (at 26-29) that the emergence of the Omicron variant undermines the need for vaccination requirements.  As the district court made clear, "[t]his case is not about whether vaccines are effective.  They are." A299 (citation omitted).  And as the CDC has explained, "COVID-19 vaccines remain the best public health measure to protect people from COVID-19 and reduce the likelihood of new variants emerging."    CDC, *Omicron Variant: What You Need to Know*, https://perma.cc/SH5T-F4X6 (last updated Feb. 10, 2022).

the proper object of th[e court's] remediation," *Lewis v. Casey*, 518 U.S. 343, 358 (1996), and awarding them relief transgresses the boundaries of relief "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). That "[f]ederal contracting is a nationwide business" (States Br. 63; ABC Br. 33), provides no basis to ignore the limitations imposed by Article III and equity principles. At a minimum, then, the injunction should be limited to plaintiffs' own contracts with the federal government.

## CONCLUSION

The preliminary injunction should be vacated in full or, at a minimum, to the extent it extends beyond plaintiffs' own federal contracts.

Respectfully submitted,

*Of Counsel:*

SAMUEL R. BAGENSTOS
  *General Counsel*

ARPIT K. GARG
  *Deputy General Counsel*

SARAH R. SCHEINMAN
  *Associate Deputy General Counsel*

SHRADDHA A. UPADHYAYA
  *Associate General Counsel*
  *Office of Management and Budget*

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

JOSHUA REVESZ
  *Counsel, Office of the Assistant Attorney*
  *General*

MARK B. STERN
ALISA B. KLEIN
DANIEL WINIK
ANNA O. MOHAN
  */s/ David L. Peters*
DAVID L. PETERS
  *Attorney, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*

February 2022

27

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,491 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in 14-point Garamond, a proportionally spaced typeface.

*/s/ David L. Peters*
David. L. Peters